[No. B085319. Second Dist., Div. Five. May 31, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
ERICK ALEJANDRO AVILA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.C.

## COUNSEL

Raymond L. Girard, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan D. Martynec and Sally P. Brajevich, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TURNER, P. J.—**

### I. INTRODUCTION

Defendant, Erick Alejandro Avila, appeals from his conviction of: the forcible rape of Jacqueline M. (Pen. Code, § 261, subd. (a)(2));[1] the kidnapping with intent to rape Jacqueline M. (§ 208, subd. (d));[2] and the forcible rape of a second victim. With respect to the forcible rape of Jacqueline M., the jury found to be true the special allegation defendant kidnapped her for the purpose of committing rape. (§ 667.8, subd. (a).) Defendant contends the trial court should have instructed the jury that *movement which substantially increased the risk of harm to the victim over and above that necessarily present in the crime of rape itself* was an element of the kidnapping with intent to rape charge. While this appeal was pending, but after defendant filed his opening brief, the California Supreme Court held in *People* v. *Rayford* (1994) 9 Cal.4th 1, 22 [36 Cal.Rptr.2d 317, 884 P.2d 1369], that the standard of asportation for section 208, subdivision (d) kidnapping is as follows in pertinent part: "Thus the standard of asportation for section 208(d) kidnapping requires that the movement of the victim be for a distance which is more than that which is merely incidental to the commission or attempted commission of rape . . . and that this movement substantially increase the risk of harm to the victim over and above that necessarily present in the commission or attempted commission of these crimes." In the published portion of this opinion, we conclude: *Rayford* is applicable to the present case; the instruction given in the present case did not comply with *Rayford*; we apply the harmless error test set forth in *Chapman* v. *California*

---

[1]All further statutory references are to the Penal Code unless otherwise noted.

[2]Section 208, subdivision (d), states in relevant part, "If the person is kidnapped with the intent to commit rape . . . the kidnapping is punishable by punishment in the state prison for 5, 8, or 11 years."

(1967) 386 U.S. 18, 22-24 [17 L.Ed.2d 705, 709-711, 87 S.Ct. 824] to the violation of defendant's federal constitutional jury trial right arising from failure to instruct as to an element of the offense; and the error was "harmless beyond a reasonable doubt." (*Id.* at p. 24 [17 L.Ed.2d at p. 711].)

## II. SUBSTANTIVE FACTS

### A. *The People's Case-in-chief*

Jacqueline M. worked as the drive-through cashier at a McDonald's restaurant on December 15, 1992. Defendant had been a customer at the drive-through for about a week. Defendant "used to always" ask whether he could give Jacqueline M. a ride home. On December 15, 1992, the victim left work at 3:45 p.m. and walked outside. Defendant was waiting for her in the front parking lot. He asked if he could give her a ride home. Jacqueline M. at first declined, but then accepted the offer of a ride. During the five-block ride to her home, Jacqueline M. agreed to go to the park with defendant and his four-year-old daughter after she changed out of her uniform. Half an hour later defendant picked Jacqueline M. up near her house. His daughter was in the car. However, they soon left defendant's daughter with her mother. Defendant held a black box in his hand which caused a clicking noise and pointed it to lock and unlock the car doors.

Jacqueline M. asked defendant to take her home. He refused. He said he wanted to go to Griffith Park and "race." After that, defendant said, he would take her home. Jacqueline M. said, " 'Okay, just go race there and just take me home.' " Defendant began "racing up" the street, "swerving around cars and just driving crazy." He was asking the victim if she wanted to be his girlfriend. She told him she did not want a boyfriend and to just take her home. Defendant said, " 'If you really want to go home, you get out right now.' " They were in the middle of the street. Jacqueline M. was about to open the door when she heard a "click." She tried to open the door and it was locked. Jacqueline M. said: " 'Why are you doing this? Just let me go out. I'll get out.' " To which defendant replied, " 'If you really want to get out, you get out through the window.' " He pulled over and put the window down. She got up on the seat to get out through the window. However, defendant rolled the window up again. Jacqueline M. said: " 'Just let me out[.] I'll go home. I don't need you to take me home.' " Defendant refused to permit her to leave. Once again, defendant began racing his car towards Griffith Park.

When they reached Griffith Park, defendant stopped and got out to use a restroom. While alone in the car, Jacqueline M. tried to open the door and to roll down the window. She could not do either. When defendant returned, she repeatedly asked him to take her home. He would not. Defendant drove fast up a hill and around curves. The victim began to feel sick. She asked

defendant to roll down the window and to take her home. He laughed and called her weak. Defendant rolled the window down one-half of an inch. Defendant stopped the car somewhere in Griffith Park. He would not roll the window down any further. Jacqueline M. tried to unlock the car door but it would not open. Defendant said, " 'Get comfortable because we're spending the night here.' " The victim told him she had to go home, she had to go to work the next day. Defendant opened the sun roof and sat back. He said, " 'I'm not going to take you home until you say you are going to be my girlfriend.' " Jacqueline M. refused. Defendant again said, " 'We are spending the night here.' " The victim protested that she had to go home. " 'Just take me home,' " she said. Defendant continued to refuse to take her home. She testified as follows: "I asked him to take me home and he said he could do whatever he wanted. He said, 'I told you we are going to stay here all night.' " After about an hour, park personnel told defendant to leave the park. They were in a truck. They flashed their lights and said the park was closed, that defendant had to leave. Defendant drove off with Jacqueline M. who thought he was taking her home.

Defendant said he was going to take Jacqueline M. to get something to eat. She told him she wanted to go home. Defendant drove to a Chinese restaurant and parked his car. The victim had no idea where they were. She could not open the car door. Defendant opened her door for her. He asked her for a kiss and she refused. He leaned over and kissed her on the lips. She felt disgusted. As defendant was leaning over her at the passenger door to his car, she tried to slip under his arm and run for a bus across the street. Defendant said: " 'You are not going nowhere. I'm going to take you home but I just want you to eat with me first.' " They walked into the restaurant. Defendant had his hand around her neck in an "arc" and came close to her from behind. Defendant ate. Jacqueline M. had two or three spoonfuls of food. They stayed in the restaurant for five or ten minutes. Defendant called her "chata," a Spanish word meaning "little round nose." Defendant said he would "love to count all the freckles on [her] body." Angrily, she responded: "All the freckles you could ever count are the only ones you could see, the ones on my face." Defendant repeatedly said: " 'No. I know you have more.' " She responded: " 'No. I don't. It is my body. I know what I have.' " He retorted: " 'You have more on your body. I'd love to count them.' " She once again became angry and said: " 'You know what? Just take me home. I don't want to hear none of this.' "

After they left the restaurant, Jacqueline M. was led to the car. Defendant then told her to wait for him while he went to the restroom. At first, she unsuccessfully attempted to get out of the car but the doors were locked. She did not try to open the door while he was gone because she believed defendant was going to take her home. Defendant returned to the car. He

said he would take Jacqueline M. home if she told him her bra size. The victim answered the questions. She testified, "I had to tell him because I wanted to go home."

Defendant then drove to a place around the corner from her house, close to where he had picked her up earlier in the day. Jacqueline M. tried to get out of the car but the door was locked. Defendant wanted to know whether she would be his girlfriend. He said he would not let her out until she gave him a hug. He leaned over to hug her and put his left hand on her breast. Jacqueline M. took his hand off. She told him, "You don't have to touch me there.'" Defendant tried to touch her again and she pushed his hands off. Defendant said, " 'It's not like they're going to fall off. Let me touch them." Defendant became angry because the victim would not let him touch her breasts. He said, " 'Well, you are going to spend the night with me.' " Jacqueline M. said, " 'Just let me out of the car.' " Defendant would not unlock the door. He started the car, made a U-turn, and drove off. He told the victim she was going to spend the night at his house with him. Jacqueline M. kept telling him to stop and let her out of the car. She was scared. Defendant drove two or three blocks and parked the car. He parked under a tree next to a high school. There were houses nearby but it was late and no one was around. The victim tried to get out of the car. The doors and windows were locked. Jacqueline M. was terrified. She testified, "He told me since I didn't let him touch me where he wanted to, he would touch me somewhere else." Defendant then violently raped her inside the locked car.

After he released her, Jacqueline M. immediately telephoned the police. The tape recording of that telephone call was played for the jury. Jacqueline M. told the emergency operator she had been raped. After defendant was arrested he called Jacqueline M. at home. She testified, "He said he didn't know what happened to him, that he went crazy."[3]

### B. *Defense Case*

Defendant called no witnesses to testify concerning the Jacqueline M. incident. In argument to the jury, defense counsel, with her client's consent, conceded defendant had raped Jacqueline M.

### III. PROCEDURAL FACTS

The court *read* to the jury an instruction on kidnapping to commit rape which included as an element that the defendant's moving the victim substantially increased the risk of harm to her over and above that necessarily

---

[3]In the body of this opinion, we have set forth the pertinent facts concerning the kidnapping and rape of Jacqueline M. However, defendant was also convicted of the December 16, 1991, rape of Blanca C. We need not address the effect of the testimony concerning the rape of Blanca C. or the state of the evidence concerning the sexual assault and aggravated kidnapping of Jacqueline M. on December 15, 1992.

present in the crime of rape itself. The court mentioned the element twice, but stopped before finishing the instruction. The court stated: "Off the record one moment. [¶] Am I reading the correct one?" The court conferred with counsel at the bench. Defense counsel asked the court to give the instruction including the risk of harm element stating, "I believe it's a correct statement of the law, having previously requested it." The court however determined it would not give that instruction, but would give the instruction which did not include the risk of harm element. The court told the jury, "I'm going to start this last one over again." The subsequent oral and written instructions on kidnapping to commit rape did not include the risk of harm element.[4]

## IV. DISCUSSION

### A. *The Asportation Standard Announced in Rayford Applies to the Present Case*

The jury was instructed, consistent with then controlling Court of Appeal case authority (*People* v. *Bradley* (1993) 15 Cal.App.4th 1144, 1151-1154 [19 Cal.Rptr.2d 276]; CALJIC No. 9.52.1 (1993)), that kidnapping with intent to rape (§ 208, subd. (d)) required movement of the victim "for a substantial distance, that is, a distance more than slight or trivial." The jury was *not* instructed it must find the required movement of the victim *which subjected her to a substantial increase in the risk of harm over and above that inherent in the crime of rape itself.* While this appeal was pending, however, the California Supreme Court issued its opinion in *People* v. *Rayford, supra,* 9 Cal.4th at page 22, in which it held increased risk of harm to the victim was an element of kidnapping with intent to commit rape. The court observed: "[T]here existed two distinct standards of asportation for kidnapping,

---

[4]The jurors were instructed as follows: "Defendant is accused . . . of having committed the crime of kidnapping with intent to commit rape, a violation of Section 208(d) of the Penal Code . . . . [¶] Every person who, with the specific intent to commit rape, kidnaps any individual, is guilty of the crime of kidnapping to commit rape in violation of Penal code Section 208(d). [¶] The specific intent to commit rape must be present when the kidnapping commences. [¶] [Kidnapping is the unlawful movement by physical force or by any other means of instilling fear of a person without that person's consent for a substantial distance where such movement is not merely incidental to the commission of the rape.] [¶] [Kidnapping is also the unlawful compulsion of another person without that person's consent and because of a reasonable apprehension of harm, to move for a substantial distance where such movement is not merely incidental to the commission of the rape.] [¶] In order to prove such crime, each of the following elements must be proved: [¶] [1. A person was [unlawfully] moved by the use of physical force,] or [¶] [1. A person was [unlawfully] compelled to move because of a reasonable apprehension of harm,] [¶] 2. The movement of such person was caused with the specific intent to rape, and the person [¶] causing such movement had such specific intent to rape when the movement commenced, [¶] 3. The movement of such person was without that person's consent, [¶] 4. The movement of such person was for a substantial distance, that is, a distance more than slight or trivial." Also, the jurors were instructed that in order to return a guilty verdict, there must "exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator."

depending on whether the kidnapping was for robbery (aggravated kidnapping) under section 209, subdivision (b) . . . , or was a simple kidnapping under section 207[, subd. (a)]." (*Id.* at pp. 11-12, fn. omitted.) Simple kidnapping requires movement of the victim "for a substantial distance, that is, a distance more than slight or trivial." (CALJIC No. 9.52.1; *People* v. *Rayford, supra,* 9 Cal.4th at p. 14.) The California Supreme Court held: "[Aggravated kidnapping] requires movement of the victim that is not merely incidental to the commission of the robbery, and which substantially increases the risk of harm over and above that necessarily present in the crime of robbery itself. [Citations.] These two aspects are not mutually exclusive, but interrelated." (*Id.* at p. 12.) *Rayford* held kidnapping with intent to rape is a separate crime from, and not an enhancement to, simple kidnapping. (*Id.* at p. 8.) Moreover, the court held the asportation standard applicable to kidnapping for rape was the two-pronged test used in aggravated kidnapping cases. (*Id.* at p. 20.) As noted previously, the Supreme Court concluded: "[T]he standard of asportation for section 208[, subdivision (d)] kidnapping requires that the movement of the victim be for a distance which is more than that which is merely incidental to the commission or attempted commission of the rape, . . . and that this movement substantially increase the risk of harm to the victim over and above that necessarily present in the commission or attempted commission of [the crime]." (*Id.* at p. 22.)[5]

█ The question arises whether *Rayford* applies to the present case. Defendant's opening brief was filed on December 19, 1994, the very day the *Rayford* opinion was issued. The Attorney General contends *Rayford* applies prospectively only. The Attorney General cites *Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 287 [279 Cal.Rptr. 592, 807 P.2d 434], and *In re Estrada* (1965) 63 Cal.2d 740, 746 [48 Cal.Rptr. 172, 408 P.2d 948], both of which discuss the general rule that a newly enacted or amended *statute* is presumed to apply prospectively only. That rule is codified in section 3.[6] The general rule with respect to *judicial decisions,* unlike statutes, is that they apply retroactively. (*United States* v. *Security Industrial Bank* (1982) 459 U.S. 70, 79 [74 L.Ed.2d 235, 243-244, 103 S.Ct. 407]; *Droeger* v. *Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 45 [283 Cal.Rptr. 584, 812 P.2d 931]; *Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978-979

---

[5]Section 667.8, subdivision (a), mandating an additional term when a victim is kidnapped for the purpose of committing a sexual offense, expressly incorporates the asportation standard of simple kidnapping. (§ 207.) Section 667.8, subdivision (a) states in relevant part: "[A]ny person convicted of a felony violation of [specified sexual offenses] who, for the purpose of committing that sexual offense, kidnapped the victim *in violation of Section 207,* shall be punished by an additional term . . . ." (Italics added.) Therefore, *People* v. *Rayford, supra,* 9 Cal.4th at page 22, is inapplicable to section 667.8 enhancements. (*People* v. *Johnson* (1995) 31 Cal.App.4th 1041, 1046-1047 [37 Cal.Rptr.2d 498].)

[6]Section 3 provides: "No part of [the Penal Code] is retroactive, unless expressly so declared."

[258 Cal.Rptr. 592, 772 P.2d 1059]; *People* v. *Guerra* (1984) 37 Cal.3d 385, 399 [208 Cal.Rptr. 162, 690 P.2d 635].) The California Supreme Court has held as a general principle its judicial decisions govern all cases which are not yet final when the decision is announced. (*People* v. *Harris* (1994) 9 Cal.4th 407, 416 [37 Cal.Rptr.2d 200, 886 P.2d 1193], citing *People* v. *Ballard* (1969) 1 Cal.App.3d 602, 606 [81 Cal.Rptr. 742]; *People* v. *Guerra*, *supra*, 37 Cal.3d at p. 400.) Furthermore, under *People* v. *Guerra* , *supra*, 37 Cal.3d at pages 399-411, and *People*.v. *Garcia* (1984) 36 Cal.3d 539, 549 [205 Cal.Rptr. 265, 684 P.2d 826], *Rayford* is applicable to the present case. In *Rayford*, the Supreme Court undertook to interpret the meaning of an enactment, section 208, subdivision (d), and to effectuate the statute as it was intended to be applied from its inception. The Supreme Court had not previously addressed the issue. Further, there was only one recent Court of Appeal decision which had addressed the issue. (*People* v. *Bradley*, *supra*, 15 Cal.App.4th at p. 1152.) The Supreme Court in *Rayford* found the Court of Appeal in *Bradley* had misconstrued the statute. Therefore, the decision in *Rayford* applies to defendant. (*People* v. *Harris*, *supra*, 9 Cal.4th at p. 416.) As a result, it is applicable to all cases which, as here, were not final when the decision was announced.

B. *The Failure to Instruct on an Element of the Offense Was Subject to a Harmless Error Analysis*

■■■ Defendant contends the failure to instruct on an element of an offense is reversible error per se, citing *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1315 [18 Cal.Rptr.2d 796, 850 P.2d 1]. The Attorney General asserts the correct standard of review is harmless error under *Chapman* v. *California*, *supra*, 386 U.S. at pages 22-24 [17 L.Ed.2d at pp. 709-711]. We conclude the *Chapman* standard applies to the failure to instruct on a single aspect of a multi-element offense in this case, where the overwhelming and uncontradicted evidence indicates the instructional error did not contribute to the verdict.

Defendant argues that his Sixth Amendment federal constitutional jury trial right was violated because the trial court neglected to instruct the jury that the asportation must have subjected the victim to a substantial increase in the risk of harm over and above that inherent in the crime of rape itself. It is well established that the Sixth Amendment guarantees a criminal defendant the right to require the prosecution to prove to have guilt proven beyond a reasonable doubt. (*Victor* v. *Nebraska* (1994) 511 U.S. __, __ [127 L.Ed.2d 583, 600, 114 S.Ct. 1239].) In *Sullivan* v. *Louisiana* (1993) 508 U.S. __, __ [124 L.Ed.2d 182, 188, 113 S.Ct. 2078], the United States Supreme Court held: "What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of

proving all elements of the offense charged, [citations], and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements . . . ." The United States Supreme Court has extended this right to constitutionally require that no jury instructions relieve the prosecution of the responsibility of proving each element beyond a reasonable doubt. In *Carella* v. *California* (1989) 491 U.S. 263, 265 [105 L.Ed.2d 218, 221-222, 109 S.Ct. 2419], the court held: "Jury instructions relieving States of this burden [of proving each element of an offense beyond a reasonable doubt] violate a defendant's due process rights. [Citations.] Such directions subvert the presumption of innocence accorded to accused persons and also invade the truth-finding task assigned solely to juries in criminal cases."

The United States Supreme Court has identified situations where jury instruction error has violated the federal Constitution. For example, an instruction that misstates the reasonable doubt standard when other instructions do not correctly formulate the prosecution's burden violates the Sixth Amendment jury trial right. (*Sullivan* v. *Louisiana*, *supra*, 508 U.S. at p. __ [124 L.Ed.2d. at p. 188]; *Cage* v. *Louisiana* (1990) 498 U.S. 39, 40-41 [112 L.Ed.2d 339, 341-342, 111 S.Ct. 328] disapproved on another point in *Estelle* v. *McGuire* (1991) 502 U.S. 62, 72-73, fn. 4 [116 L.Ed.2d 385, 399, 112 S.Ct. 475].) Also, instructions which require the jury to presume as true an element of an offense are violative of a defendant's Sixth Amendment jury trial right. (*Yates* v. *Evatt* (1991) 500 U.S. 391, 401-402 [114 L.Ed.2d 432, 447-448, 111 S.Ct. 1884] disapproved on another point in *Estelle* v. *McGuire*, *supra*, 502 U.S. at pp. 72-73, fn. 4 [116 L.Ed.2d at p. 399] [malice implied from use of a deadly weapon in homicide case]; *Carella* v. *California*, *supra*, 491 U.S. at pp. 264-265 [105 L.Ed.2d at pp. 220-222] [failure to return a rented car within certain time periods creates presumptions of embezzlement or fraud]; *Burger* v. *Kemp* (1987) 483 U.S. 776, 782, fn. 5 [97 L.Ed.2d 638, 650, 107 S.Ct. 3114] [a person presumed to intend "natural and probable consequences" of acts]; *Francis* v. *Franklin* (1985) 471 U.S. 307, 309-327 [85 L.Ed.2d 344, 350-362, 105 S.Ct. 1965] [presumption of malice in murder case]; *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 517-527 [61 L.Ed.2d 39, 46-53, 99 S.Ct. 2450] [presumption of malice in homicide prosecution].) Also, the failure to correctly instruct as to an element of an offense can violate the United States Constitution. (*Pope* v. *Illinois* (1987) 481 U.S. 497, 500-501 [95 L.Ed.2d 439, 444-446, 107 S.Ct. 1918] [misinstruction that ordinary member of a community, rather than the correct instruction a reasonable person, must find serious literary, artistic, political, or scientific value in allegedly obscene material in order for First Amendment protection to apply].)

There are other circumstances where the United States Supreme Court has found instructional error did not violate the Constitution. For example, in

*Victor* v. *Nebraska, supra,* 511 U.S. __ [127 L.Ed.2d. at pages 600-601], the court concluded erroneous language in Nebraska and California reasonable doubt instructions did not violate the Constitution. This was because when taken as a whole the juries were correctly advised as to the concept of reasonable doubt. *(Ibid.)* In *Estelle* v. *McGuire, supra,* 502 U.S. at page 74 [116 L.Ed.2d at page 400], the Supreme Court held that no constitutional violation occurred when there was no reasonable likelihood the jurors in responding to the state court judge's potentially unconstitutional instructions considering prior crimes improperly utilized "propensity evidence." In *Boyde* v. *California* (1990) 494 U.S. 370, 381 [108 L.Ed.2d 316, 329-330, 110 S.Ct. 1190], the court held that no Eighth or Fourteenth Amendment violations occurred when there was no reasonable likelihood the jurors applied possibly ambiguous instructions to preclude consideration of mitigating factors in capital litigation.[7]

The present case does not involve a failure to instruct on reasonable doubt, the use of a an improper presumption, or misinstruction concerning an element of a First Amendment defense in an obscenity prosecution. Nonetheless, the complete failure to instruct as to an element of an offense violates the United States Constitution because such relieves the prosecution of its burden of proving all of the elements of the charged crime beyond a reasonable doubt. *(Sullivan* v. *Louisiana, supra,* 508 U.S. __ [124 L.Ed.2d at p. 188]; *Carella* v. *California, supra,* 491 U.S. at p. 265 [105 L.Ed.2d at pp. 221-222].) This rule is subject to the qualification that no constitutional violation occurs if there is a reasonable likelihood the jurors understood they were required to find the omitted element to be true in order to return a guilty verdict. (Cf. *Victor* v. *Nebraska, supra,* 511 U.S. at p. __ [127 L.Ed.2d at pp. 600-601]; *Estelle* v. *McGuire, supra,* 502 U.S. at p. 74 [116 L.Ed.2d at p. 400]; *Boyde* v. *California, supra,* 494 U.S. at p. 381 [108 L.Ed.2d at pp. 329-330].) Applying this rule to the present case, we find defendant's federal constitutional jury trial right was violated when the jury was not instructed that in order to convict him of the aggravated kidnapping of Jacqueline M., it must find the asportation subjected her to a substantial risk of harm over and above that inherent in the crime of rape itself. The jury

---

[7] We recognize the test for determining whether a constitutional violation has occurred in the instructional context when a state court conviction is collaterally challenged by way of a federal habeas corpus petition is different from that we have described in the body of this opinion. On federal habeas corpus review, "[t]he only question . . . is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [Citations.] ' "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constutitional] right' ")." (*Estelle* v. *McGuire, supra,* 502 U.S. at p. 72 [116 L.Ed.2d at p. 399]; accord, *Cupp* v. *Naughten* (1973) 414 U.S. 141, 146 [38 L.Ed.2d 368, 373, 94 S.Ct. 396].) We do not apply this test because we are reaching the question of a constitutional violation on direct appeal and such a standard of review has never been adopted by the California Supreme Court.

was not advised it was to apply such an element to defendant. Taken as a whole, the instructions never related to the jurors the increased risk of harm element.

 We now address the question of what reversible error test we must apply to the failure to instruct concerning a single element of an offense in this case. Citing the California Supreme Court decision in *People* v. *Cummings, supra,* 4 Cal.4th at pages 1311-1315, defendant argues we must apply the reversible per se test to the present federal constitutional error. The Attorney General contends we must apply the harmless error test set forth in *Chapman* v. *California, supra,* 386 U.S. at pages 22-24 [17 L.Ed.2d at pages 709-711]. Because the present case does not involve a structural error which withdrew "from jury consideration substantially all of the elements of an offense" (*People* v. *Cummings, supra,* 4 Cal.4th at p. 1315), we apply the *Chapman* standard of review for the following reasons.

The United States Supreme Court has applied the reversible error per se standard in the constitutional instructional error context in limited circumstances, none of which are present in this case. In *Rose* v. *Clark* (1986) 478 U.S. 570, 576-577 [92 L.Ed.2d 460, 469-470, 106 S.Ct. 3101] a case involving an improper presumption instruction, the United States Supreme Court set forth the following general rule, which we recite at length, concerning when the *Chapman* standard would apply: "In *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], (1967), this Court rejected the argument that errors of constitutional dimension necessarily require reversal of criminal convictions. And since *Chapman,* 'we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' *Delaware* v. *Van Arsdall,* 475 U.S. 673, 681 [89 L.Ed.2d 674, 684-685, 106 S.Ct. 1431], (1986). That principle has been applied to a wide variety of constitutional errors. *E.g., id.,* at 684 [89 L.Ed.2d at pp. 686-687], (failure to permit cross-examination concerning witness bias); *Rushen* v. *Spain,* 464 U.S. 114, 118 [78 L.Ed.2d 267, 273, 104 S.Ct. 453], (1983) (*per curiam* ) (denial of right to be present at trial); *United States* v. *Hasting,* 461 U.S. 499, 508-509 [76 L.Ed.2d 96, 105-106, 103 S.Ct. 1974], (1983) (improper comment on defendant's failure to testify); *Moore* v. *Illinois,* 434 U.S. 220, 232 [54 L.Ed.2d 424, 436, 98 S.Ct. 458], (1977) (admission of witness identification obtained in violation of right to counsel); *Milton* v. *Wainwright,* 407 U.S. 371 [33 L.Ed.2d 1, 92 S.Ct. 2174], (1972) (admission of confession obtained in violation of right to counsel); *Chambers* v. *Maroney,* 399 U.S. 42, 52-53 [26 L.Ed.2d 419, 428-430, 90 S.Ct. 1975], (1970) (admission of evidence obtained in violation of the Fourth Amendment). See also *Hopper* v. *Evans,* 456 U.S. 605, 613-614 [72 L.Ed.2d 367, 374-375, 102

S.Ct. 2049], (1982) (citing *Chapman* and finding no prejudice from trial court's failure to give lesser included offense instruction). Our application of harmless-error analysis in these cases has not reflected a denigration of the constitutional rights involved. Instead, as we emphasized earlier this Term: [¶] 'The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, *United States* v. *Nobles*, 422 U.S. 225, 230 [45 L.Ed.2d 141, 148-149, 95 S.Ct. 2160](1975), and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. Cf. R. Traynor, The Riddle of Harmless Error 50 (1970) ("Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it").' *Delaware* v. *Van Arsdall, supra,* [475 U.S.] at 681 [89 L.Ed.2d at pp. 684-685]." However, the United States Supreme Court described circumstances where the *Chapman* standard would be inapplicable when it noted : "Despite the strong interests that support the harmless-error doctrine, the Court in *Chapman* recognized that some constitutional errors require reversal without regard to the evidence in the particular case. 386 U.S., at 23, n. 8 [17 L.Ed.2d at p. 710], citing *Payne* v. *Arkansas*, 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844], (1958) (introduction of coerced confession); *Gideon* v. *Wainwright*, 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733][,] (1963) (complete denial of right to counsel); *Tumey* v. *Ohio*, 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243], (1927) (adjudication by biased judge). This limitation recognizes that some errors necessarily render a trial fundamentally unfair. The State of course must provide a trial before an impartial judge, *Tumey* v. *Ohio, supra,* with counsel to help the accused defend against the State's charge, *Gideon* v. *Wainwright, supra.* Compare *Holloway* v. *Arkansas*, 435 U.S. 475, 488-490[,] [55 L.Ed.2d 426, 436-438, 98 S.Ct. 1173] (1978), with *Cuyler* v. *Sullivan*, 446 U.S. 335, 348-350[,] [64 L.Ed.2d 333, 346-348, 100 S.Ct. 1708] (1980). Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, see *Powell* v. *Alabama*, 287 U.S. 459[,] [77 L.Ed. 158, 53 S.Ct. 55, 84 A.L.R. 527] (1932), and no criminal punishment may be regarded as fundamentally fair. Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury. See *Delaware* v. *Van Arsdall, supra,* at 681 [89 L.Ed.2d at pp. 684-685], (constitutional errors may be harmless 'in terms of their effect on the *factfinding process at trial*') (emphasis added); *Chapman, supra,* at 24 [17 L.Ed.2d at pp. 710-711] (error is harmless if, beyond a reasonable doubt, it 'did not *contribute to the verdict obtained*') (emphasis added). [¶] Similarly, harmless-error analysis presumably would not apply if a court directed a verdict for the prosecution in a criminal trial

by jury. We have stated that 'a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict . . . regardless of how overwhelmingly the evidence may point in that direction.' *United States* v. *Martin Linen Supply Co.*, 430 U.S. 564, 572-573[,] [51 L.Ed.2d 642, 651-652, 97 S.Ct. 1349] (1977) (citations omitted). Accord, *Carpenters* v. *United States*, 330 U.S. 395, 408[,] [91 L.Ed. 973, 985, 67 S.Ct. 775] (1947). This rule stems from the Sixth Amendment's clear command to afford jury trials in serious criminal cases. See *Duncan* v. *Louisiana*, 391 U.S. 145[,] [20 L.Ed.2d 491, 88 S.Ct. 1444] (1968). Where that right is altogether denied, the State cannot contend that the deprivation was harmless because the evidence established the defendant's guilt; the error in such a case is that the wrong entity judged the defendant guilty."[8] (*Rose* v. *Clark, supra,* 478 U.S. at pp. 577-578 [92 L.Ed.2d at pp. 470-471], fn. omitted, original italics.) ■ Despite the fact there were circumstances where the *Chapman* standard was inapplicable, the *Rose* court concluded that such was the exception to the general rule when it held: "We have emphasized, however, that while there are some errors to which *Chapman* does not apply, they are the exception and not the rule. *United States* v. *Hasting, supra,* [461 U.S.] at 509 [76 L.Ed.2d at p. 106]. Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.' *Delaware* v. *Van Arsdall,* 475 U.S., at 681 [89 L.Ed.2d at pp. 684-685]; *United States* v. *Hasting,* 461 U.S., at 508-509." (*Id.* at pp. 578-579 [92 L.Ed.2d at p. 471].)

The *Rose* court held that a rebuttable presumption that when a killing occurred, it was " 'done maliciously' " (478 U.S. at p. 574 [92 L.Ed.2d at p. 468]), was subject to the *Chapman* harmless error standard. The court noted that the *Chapman* standard could be applied where: "a reviewing court can find that the record . . . establishes guilt beyond a reasonable doubt" (*Rose* v. *Clark, supra,* at p. 579 [92 L.Ed.2d at p. 471]); in a case "[where] the

[8]In *Rose* v. *Clark, supra,* 478 U.S. at page 577 [92 L.Ed.2d at page 470], the Supreme Court referred to its description in *Chapman* v. *California, supra,* 386 U.S. at page 23, footnote 8 [17 L.Ed.2d at page 710] of *Payne* v. *Arkansas* (1958) 356 U.S. 560, 567-568 [2 L.Ed.2d 975, 980-981, 78 S.Ct. 844] as a decision which holds that introduction of a coerced confession was subject to a reversible error per se test. In *Arizona* v. *Fulminate* (1991) 499 U.S. 279, 309 [113 L.Ed.2d 302, 330-331, 111 S.Ct. 1246], the United States Supreme Court held *Payne* was not a reversible error per se case; rather the *Fulminate* court held the issue of whether to apply a reversible error per se test was never squarely addressed in *Payne*.

predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury" (*id.* at pp. 580-581 [92 L.Ed.2d at p. 472], original italics); and there was an impartial judge where the accused was represented by counsel. (*Id.* at pp. 579, 582 [92 L.Ed.2d at pp. 471, 473-474].)

The United States Supreme Court has applied *Rose* under varying circumstances in other instructional error cases. In *Pope v. Illinois, supra,* 481 U.S. at pages 500-501 [95 L.Ed.2d at pages 444-446], the *Chapman* standard was applied to a misinstruction concerning the requirement that reasonable person view allegedly obscene material as being without " 'serious literary, artistic, political, or scientific value' " in order for a criminal sanction to be imposed. Citing *Rose,* the court held that the *Chapman* standard applied. (*Pope v. Illinois, supra,* 481 U.S. at p. 502-503 [95 L.Ed.2d at pp. 446-447].) In *Burger v. Kemp, supra,* 483 U.S. at pages 782-783, footnote 5 [97 L.Ed.2d at page 650], the Supreme Court held that an improper presumption was harmless error under *Rose* because " ' "the evidence was so dispositive of intent" ' " that it could be said beyond a reasonable doubt " ' "that the jury would have found it unnecessary to rely on the presumption." ' " In *Carella v. California, supra,* 491 U.S. at page 265 [105 L.Ed.2d at pages 221-222], the following improper presumptions were presented to the jury: "Carella's jury was told first that a person 'shall be presumed to have embezzled' a vehicle if it is not returned within 5 days of the expiration of the rental agreement; and second, that 'intent to commit theft by fraud is presumed' from the failure to return rented property within 20 days of demand." Citing the aforementioned analysis in *Rose* that there are cases where the predicate facts conclusively establish an intent to commit the crime (*Rose v. Clark, supra,* 478 U.S. at pp. 580-581 [92 L.Ed.2d at pp. 471-473]); the *Carella* court applied *Chapman* and remanded to the lower court to engage in the following determination: "We follow the same course here and reverse the judgment of the California court without deciding here whether no rational jury could find the predicate acts but fail to find the fact presumed." (*Carella v. California, supra,* 491 U.S. at p. 267 [105 L.Ed.2d at pp. 222-223].) In *Yates v. Evatt, supra,* 500 U.S. at page 401 [114 L.Ed.2d at page 447], the following improper presumptions were presented to the jury: "The jury was told that 'malice is implied or presumed' from the 'willful, deliberate, and intentional, doing of an unlawful act' and from the 'use of a deadly weapon.' " The problem with these presumptions, which were classified as "rebuttable" in certain respects, was that they tended to shift the malice burden of proof from the prosecution to the accused. (*Id.* at p. 402 [114 L.Ed.2d at pp. 447-448].) The *Yates* court held that the *Chapman* standard applied to the two erroneous presumptions. (*Yates v. Evatt, supra,* 500 U.S. at p. 402 [114 L.Ed.2d at pp. 447-448].)

One instructional error decision by the United States Supreme Court in the post-*Rose* environment has applied a reversible per se rule—*Sullivan* v.

*Louisiana, supra,* 508 U.S. at page __ [124 L.Ed.2d at pages 190-191] where the proof beyond a reasonable doubt instruction failed to comply with the Sixth Amendment. After noting that other constitutional instructional errors could be the subject to harmless error analysis because the incorrect instructions may have played "no significant role in the finding of guilt beyond a reasonable doubt," the Supreme Court drew the following distinction: "But the essential connection to a 'beyond-a-reasonable-doubt' factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings. A reviewing court can only engage in pure speculation—its view of what a reasonable jury would have done. And when it does that, 'the wrong entity judge[s] the defendant guilty.' [Citation.] [¶] Another mode of analysis leads to the same conclusion that harmless-error analysis does not apply: In [*Arizona* v. *Fulminate, supra,* 499 U.S. at pp. 307-308 (113 L.Ed.2d at pp. 329-330)], we distinguished between, on the one hand, 'structural defects in the constitution of the trial mechanism, which defy analysis by "harmless error" standards,' and, on the other hand, trial errors which occur 'during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented.' [Citation.] Denial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly an error of the former sort, the jury guarantee being a 'basic protectio[n]' whose precise effects are unmeasureable, but without which a criminal trial cannot reliably serve its function, [citation]. The right to trial by jury reflects, we have said, 'a profound judgment about the way in which law should be enforced and justice administered.' [Citation.] The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" (Original italics.) *Sullivan* is the sole post-*Rose* United States Supreme Court case to apply a reversible error per se test in the instructional error context.[9]

▮ The present case is entirely different from the situation present in *Sullivan* because no structural error is present. This case does not contain what the United States Supreme Court has described as a "structural defect"

---

[9]*Sullivan* v. *Louisiana, supra,* 508 U.S. at pages __ [124 L.Ed.2d at pages 190-191] as discussed in the body of the opinion applied the reversible error per se to misinstruction concerning proof beyond a reasonable doubt. However, in *Victor* v. *Nebraska, supra,* 511 U.S. at page __ [127 L.Ed.2d at page 601], after contrasting the instruction in *Sullivan,* the court held that even misinstruction concerning reasonable doubt was not violative of the Sixth Amendment under the following circumstances: "In these cases, however, we conclude that 'taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury.' [Citation.] There is no reasonable likelihood that the jurors who determined petitioners' guilt applied the instructions in a way that violated the Constitution." *Victor* was not a decision premised on harmless error. Rather, in *Victor,* the court determined that because there was no reasonable likelihood that the instructions taken as a whole, including the misinstruction, were applied by the jurors so as to violate the proof beyond a reasonable doubt requirement, the Sixth Amendment was not violated.

(*Sullivan* v. *Louisiana*, *supra*, 508 U.S. at p. __ [124 L.Ed.2d at p. 190]; *Brecht* v. *Abrahamson* (1993) 507 U.S. __, __ [123 L.Ed.2d 353, 367, 113 S.Ct. 1710]; *Arizona* v. *Fulminante*, *supra*, 499 U.S. at p. 310 [113 L.Ed.2d at pp. 331-332]); rather, this case is more akin to a situation where a constitutionally deficient jury instruction relating to a single element of an offense or a defense is presented to the jury. (*Carella* v. *California*, *supra*, 491 U.S. at p. 265 [105 L.Ed.2d at pp. 221-222] [failure to return a rented car within certain time periods created improper presumptions of embezzlement or fraud]; *Pope* v. *Illinois*, *supra*, 481 U.S. at pp. 500-504 [95 L.Ed.2d at pp. 444-448] [misinstruction concerning First Amendment limitations on the prosecution in an obscenity case]; *Rose* v. *Clark*, *supra*, 478 U.S. at pp. 576-584 [92 L.Ed.2d at pp. 469-475] [improper instruction creating a presumption concerning the single element of malice in a homicide prosecution].) Further, the present case is more similar to *Hopper* v. *Evans* (1982) 456 U.S. 605, 610-614 [72 L.Ed.2d 367, 372-375, 102 S.Ct. 2049], where the court applied the *Chapman* standard to a situation where a trial judge pursuant to statute failed to instruct in a capital case concerning lesser included offenses in violation of the decision in *Beck* v. *Alabama* (1980) 447 U.S. 625, 627 [65 L.Ed.2d 392, 396-397, 100 S.Ct. 2382]. Finally, the United States Supreme Court has held that the failure to instruct on every element is not in every case reversible error. In other words, contrary to defendant's assertions, the failure to instruct as to an element does not require in every situation a reversal. In *Pope* v. *Illinois*, *supra*, 481 U.S. at pages 503-504, footnote 7 [95 L.Ed.2d at page 447], the court explicitly stated, "To the extent that cases prior to *Rose* may indicate that a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof, see, *e.g., Cabana* v. *Bullock*, 474 U.S. 376, 384 [88 L.Ed.2d 704, 715, 106 S.Ct. 689] (1986), after *Rose*, they are no longer good authority."[10]

Further, we reject defendant's argument that we are compelled to apply a reversible error per se standard under the federal Constitution because of the

---

[10]The language in *Pope* v. *Illinois*, *supra*, 481 U.S. at pages 503-504, footnote 7 [95 L.Ed.2d at page 447] indicating that pre-*Rose* authority that a conviction "can never stand" if there is a failure to instruct on "each element of the crime" was now disapproved by the United States Supreme Court is of considerable consequence. The language in the prior decision which was disapproved in *Pope* was as follows: "A defendant charged with a serious crime has the right to have a jury determine his guilt or innocence, [citation], *and a jury's verdict cannot stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof,* [citation]. Findings made by a judge cannot cure deficiencies in the jury's finding as to the guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the crime. [Citations.]" (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 384-385 [88 L.Ed.2d 704, 715, 106 S.Ct. 689], italics added.) The *Pope* court was explicitly disapproving the language in *Cabana* which held that a "verdict cannot stand" if the jury was not required to find each element of the crime. In the present case, defendant is contending that the verdict cannot stand merely because of the failure to instruct as to an element—a rule of federal constitutional law rejected by the United States Supreme Court in *Pope*.

holding of the California Supreme Court in *People* v. *Cummings, supra*, 4 Cal.4th at pages 1312-1315. In *Cummings*, the trial court failed to instruct the jury as to four of the five elements of robbery. After discussing *Rose*, *Yates*, and *Carella*, the *Cummings* court held, "Moreover, none [of the United States Supreme Court authority] suggests that a harmless error analysis may be applied to instructional error which withdraws from jury consideration substantially all of the elements of an offense and did not require by other instructions that the jury find the existence of the facts necessary to a conclusion that the omitted element had been proved." (*People* v. *Cummings, supra*, 4 Cal.4th at p. 1315.) Unlike *Cummings*, the present case does not involve an instructional error which "withdraws from jury consideration substantially all of the elements of an offense . . . ." (*Ibid.*) Rather, the present case involves a situation where substantially all of the elements of the kidnapping with intent to rape charge were presented to the jury. Moreover, *Cummings* was decided prior to *Sullivan* v. *Louisiana, supra*, 508 U.S. at page __ [124 L.Ed.2d at pages 190], where the United States Supreme Court held that *Chapman* harmless error analysis was inapplicable to the failure to correctly instruct on reasonable doubt because such misdescribed the burden of proof thereby "vitiat[ing] *all* the jury's findings." (Original italics.) The situation in *Cummings* where four of the five elements were not the subject of instruction is closely akin to that in *Sullivan*. When a majority of the instructions concerning the charged offense are omitted as they were in *Cummings*, this constitutes a " 'structural defect[] in the constitution of the trial mechanism , which def[ies] analysis by "harmless-error" standards . . . .' " (*Sullivan* v. *Louisiana, supra*, 508 U.S. __ [124 L.Ed.2d at p. 187].) However, the failure to instruct on a single element does not in every case raise such structural problems in the guilt determination process so that the effect of the error may not be "quantifiably assessed." (*Id.* at p. 190 [124 L.Ed.2d at p. 187].) Finally, as noted previously, after *Rose*, prior United States Supreme Court decisional authority which suggested that the failure to instruct as to each element of an offense required reversal was disapproved. (*Pope* v. *Illinois, supra*, 481 U.S. at pp. 503-504, fn. 7 [95 L.Ed.2d at p. 447].) We emphatically reject the suggestion that the California Supreme Court in *Cummings* was establishing a rule requiring reversal in every case where the trial judge's instructions omitted an instruction concerning a single element of the charged offense. Such a rule was never articulated in *Cummings*, a case involving the failure to instruct on substantially all of the elements of the crime of robbery. Further, defendant's reading of *Cummings* is in conflict with the express language contained in *Pope* v. *Illinois, supra*, 481 U.S. at pages 503-504, footnote 7 [95 L.Ed.2d at

pages 447]. The California Supreme Court never purported to contradict *Pope*, something it would never do in the first place.[11]

---

[11]In the post-*Rose* environment, the federal circuit courts have been in disagreement as to whether the failure to instruct concerning an single element of an offense is subject to the *Chapman* harmless error test. The Sixth Circuit has held such error is reversible error per se. (*Hoover* v. *Garfield Heights Mun. Court* (6th Cir. 1986) 802 F.2d 168, 177-178 [failure to instruct on lawful arrest element of resisting arrest under Ohio law].) However, the Sixth Circuit has subsequently observed that its decision in *Hoover* "may not be long for this world in light of recent Supreme Court trends. [Citations.]" (*U.S.* v. *Dotson* (6th Cir. 1990) 895 F.2d 263, 265.) By contrast, the Second and Seventh Circuits have held that the *Chapman* standard is applicable when a court fails to instruct as to elements of an offense. (*Ianniello* v. *U.S.* (2d Cir. 1993) 10 F.3d 59, 63-65 [failure to instruct in a RICO action that predicate acts must be interrelated]; *U.S.* v. *Parmelee* (7th Cir. 1994) 42 F.3d 387, 392, cert. applied for April 27, 1995, Supreme Ct. Dock. No. 94-1933) [failure to instruct on guilty knowledge requirement of transporting illegal aliens under federal statute].)

The Ninth Circuit Court of Appeals recently held "the failure to instruct on any of the elements of an offense cannot be analyzed by harmless error principles and requires automatic reversal." (*Harmon* v. *Marshall* (9th Cir. 1995) 59 F.3d 763, 764.) In *Harmon,* the trial court had given no instruction defining the elements of two of the twelve offenses of which the defendant was convicted. The Ninth Circuit Court of Appeals affirmed the district court's order granting the defendant's habeas corpus petition. The court cited *U.S.* v. *Gaudin* (9th Cir. 1994) 28 F.3d 943, 951, and *U.S.* v. *Stein* (9th Cir. 1994) 37 F.3d 1407, 1410, for the proposition "omitting instruction on, or otherwise failing to submit to the jury, one element of an offense is reversible per se. [Citation.]" (*Harmon* v. *Marshall, supra,* 59 F.3d at p. 764.) *Gaudin* was a plain error case (Fed. Rules Crim.Proc., rule 52(b), 18 U.S.C. [error not objected to in the trial court but "affecting substantial rights"]) in which the district court judge had erroneously instructed the jury on an element of the charged offense as having been established as a matter of law. The Ninth Circuit Court of Appeals held the error was "a fundamental structural error" (*U.S.* v. *Gaudin, supra,* 28 F.3d at p. 952) which "cannot be harmless" and was plain error. (*Id.* at p. 951.) *Gaudin* was affirmed by the United States Supreme Court to the extent it held the element at issue was a question of fact for the jury. (*U.S.* v. *Gaudin* (1995) 515 U.S. __, __ [132 L.Ed.2d 444, 458, 115 S.Ct. 2310].) The United States Supreme Court did not reach the question whether the error could be harmless. (See *id.* at p. __, conc. opn. of Rehnquist, C. J.).) Another Ninth Circuit decision, *U.S.* v. *Stein, supra,* 37 F.3d at pages 1409-1410, involved conflicting instructions on the knowledge element of a money laundering charge. The Ninth Circuit Court of Appeals held the instructions "[t]aken as a whole, . . . omitted an element of the offense as surely as if the district court had failed to mention the element altogether." (*Id.* at p. 1410.) The court concluded the error was reversible per se. (*Ibid.*) The final pertinent Ninth Circuit case to apply a reversible error per se decision, *U.S.* v. *Hove* (9th Cir. 1995) 52 F.3d 233, 235-236, held the failure to instruct on the willfulness element of currency structuring was plain error and could not be harmless.

By contrast, the Ninth Circuit Court of Appeals *has* found harmless error analysis applicable in other instructional error cases. For example, in *Roy* v. *Gomez* (9th Cir. 1995) 55 F.3d 1483, 1485), the court held, on appeal from the denial of a petition for habeas corpus, that the omission of an element of aider and abettor liability under California law, so-called "*Beeman* error," was not prejudicial. Therefore, the defendant was not entitled to habeas corpus relief. (*Id.* at p. 1486; accord, *Martinez* v. *Borg* (9th Cir. 1991) 937 F.2d 422, 424-426 [concluding "*Beeman* error" was subject to harmless error analysis].) In *U.S.* v. *Whitmore* (9th Cir. 1994) 24 F.3d 32, 33, a defendant appealed his conviction of using a communication facility to engage in drug trafficking in violation of federal law. The question before the court was whether the district court's failure to instruct on the knowledge element of the offense was

To sum up, apart from the fact that the present case is distinguishable from *Cummings*, the California Supreme Court has never held that the failure to instruct as to a single element is not susceptible to harmless error analysis. This is quite understandable given the fact that the United States Supreme Court, as noted previously, has consistently applied *Chapman* to instructional error cases involving either misinstruction of a single element of a charged crime or a constitutional defense. *Cummings*, which involved a structural defect, the virtual complete failure to define a crime, does not require the application of the reversible error per se standard to the present case.

■ We turn now to what factors we may consider in determining whether the error was in fact harmless. The United States Supreme Court has repeatedly noted that in conducting *Chapman* harmless error analysis, we must evaluate the "entire record . . . ." (*Rose* v. *Clark*, *supra*, 478 U.S. at p. 583 [92 L.Ed.2d at p. 474]; *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 681 [89 L.Ed.2d 674, 684-685, 106 S.Ct. 1431]; *United States* v. *Hasting* (1983) 461 U.S. 499, 509, fn. 7, 510 [76 L.Ed.2d 96, 106, 107, 103 S.Ct. 1974].) The initial step in *Chapman* analysis for a reviewing court is as follows, "First, it must ask what evidence the jury actually considered in reaching its verdict." (*Yates* v. *Evatt*, *supra*, 500 U.S. at p. 404 [114 L.Ed.2d

plain error. (*Ibid.*) The court held the error was not prejudicial within the meaning of the plain error rule and concluded: "Rather, the error was harmless beyond a reasonable doubt." (*Id.* at p. 35.) The court explained: " 'The harmfulness of an error must necessarily be considered in order to determine if the error is plain error justifying reversal, because if an error is harmless, it cannot be plain error.' [Citation.]" (*Ibid.*) The court distinguished *U.S.* v. *Gaudin*, *supra*, 28 F.3d at pages 951-952, as having involved the complete removal of an element from the jury's consideration. (*U.S.* v. *Whitmore*, *supra*, 24 F.3d at p. 36.) The court concluded that under the facts of *Whitmore*, and the instructions given in that case, the omitted instruction was harmless. (*Id.* at pp. 36-37.) In *Hennessy* v. *Goldsmith* (9th Cir. 1991) 929 F.2d 511, 514-517, on appeal from a grant of habeas corpus, the Ninth Circuit Court of Appeals held the failure to instruct on an element of second degree kidnapping under Arizona law was subject to harmless error analysis.

None of the Ninth Circuit panels have discussed the language in *Pope* v. *Illinois*, *supra*, 481 U.S. at page 504, footnote 7 [95 L.Ed.2d at p. 447], which we find controlling. There, as noted in the body of this opinion, the United States Supreme Court stated: "To the extent that cases prior to *Rose* may indicate that a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof, see, *e.g.*, *Cabana* v. *Bullock* . . . , after *Rose*, they are no longer good authority." As discussed above, the language in *Cabana* which was disapproved in *Pope* was as follows: "A defendant charged with a serious crime has the right to have a jury determine his guilt or innocence, [citation], *and a jury's verdict cannot stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof,* [citation]. Findings made by a judge cannot cure deficiencies in the jury's finding as to the guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the crime. [Citations.]" (*Cabana* v. *Bullock*, *supra*, 474 U.S. at pp. 384-385 [88 L.Ed.2d at p. 715], italics added.) We are bound by *Pope*, find it to be the controlling decisional authority, and apply it in the present case.

at p. 449].) Then, a reviewing court "must then weigh the probative force of that evidence as against the probative force of the [erroneous instruction] standing alone." (*Ibid.*) In analyzing the prejudicial effect of a constitutional instructional error, we may consider the fact that the evidence and proof of guilt concerning the omitted element is overwhelming, uncontradicted, or dispositive. (*Rose* v. *Clark, supra,* 478 U.S. at p. 583 [92 L.Ed.2d at p. 474]; *Burger* v. *Kemp, supra,* 483 U.S. at pp. 782-783, fn. 5 [97 L.Ed.2d at p. 650].) Further, in conducting federal constitutional review, the United States Supreme Court has held, "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." (*Henderson* v. *Kibbe* (1977) 431 U.S. 145, 155 [52 L.Ed.2d 203, 213, 97 S.Ct. 1730].)[12] Finally, in *Pope* v. *Illinois, supra,* 481 U.S. at page 503, footnote 6 [95 L.Ed.2d at page 447], the United States Supreme Court indicated its prior holding in *Rose* required on appeal a review of the record be made to determine whether "the facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same."

■ There error in the present case was harmless beyond a reasonable doubt. The failure to instruct the jury that, in order to convict, the jury was required to find that the movement of Jacqueline M. substantially increased the risk of harm to her over and above that present in the crime of rape itself, did not contribute to the verdict. (*Rose* v. *Clark, supra,* 478 U.S. at p. 583 [92 L.Ed.2d at p. 474].) The evidence that the movement increased the risk of harm substantially over and above that present in the crime of rape itself was uncontradicted. Jacqueline M. testified without contradiction she was held against her will and driven around for several hours. During part of the time defendant was driving, he was racing the car in "Griffith Park." She testified defendant was "racing" up a street, "swerving around cars," and "driving crazy." Defendant did not testify. Hence, the uncontradicted evidence established that extraordinary danger experienced by Jacqueline M. was substantially greater than that present in the crime of rape.

California Supreme Court authority establishes that such evidence meets the test of increased risk of harm which is an element of aggravated

---

[12]Except for the Eighth and District of Columbia Circuits which have never addressed the issue, the federal Courts of Appeals are in accord that in conducting constitutional review of jury instruction issues, failure to instruct concerning an element is less prejudicial than misinstruction. (*Robinson* v. *Ponte* (1st Cir. 1991) 933 F.2d 101, 105; *Roy* v. *Coxon* (2d Cir. 1990) 907 F.2d 385, 388; *United States* ex rel. *Dorey* v. *State of N. J.* (3d Cir. 1977) 560 F.2d 584, 587; *Cooper* v. *State of N. C.* (4th Cir. 1983) 702 F.2d 481, 484; *Sullivan* v. *Blackburn* (5th Cir. 1986) 804 F.2d 885, 887; *Martin* v. *Foltz* (6th Cir. 1985) 773 F.2d 711, 718; *United States* ex rel. *Bonner* v. *DeRobertis* (7th Cir. 1986) 798 F.2d 1062, 1067; *United States* v. *Cruz* (9th Cir. 1986) 783 F.2d 1470, 1472; *Maes* v. *Thomas* (10th Cir. 1995) 46 F.3d 979, 984; *Jacobs* v. *Singletary* (11th Cir. 1992) 952 F.2d 1282, 1290.)

kidnapping for robbery or with the intent to rape. (§§ 208, subd. (d), 209.) In the decision of *In re Earley* (1975) 14 Cal.3d 122, 131-132 [120 Cal.Rptr. 881, 534 P.2d 721], the California Supreme Court described the circumstances where the increased risk of harm element in an aggravated kidnapping case was established as follows: "The 'risk of harm' test may also be satisfied in the absence of a deadly weapon under some circumstances. For example, in *People* v. *Thornton* [(1974)] 11 Cal.3d 738, 750, 767-768 [114 Cal.Rptr. 467, 523 P.2d 267], after 8 p.m. the defendant forced his way into one victim's car and, seizing her around the throat with his arm, informed her he wanted her money. Rather than carrying out the robbery at that location, however, the defendant drove the victim four blocks—steering with one hand while keeping her pinioned to the seat by means of his arm around her throat. After parking, defendant took the victim's money and sexually assaulted her. *Thornton*, in holding that as a matter of law the risk of harm to the victim was substantially increased, reasoned (at p. 768), 'Clearly any substantial asportation which involves forcible control of the robbery victim such as that occurring in this case exposes her to grave risks of harm to which she would not have been subject had the robbery occurred at the point of initial contact.' (See also *People* v. *Stephenson* [(1974)] 10 Cal.3d 652, 657-661 [111 Cal.Rptr. 556, 517 P.2d 820].) [¶] Here, as in *Thornton*, there was substantial asportation of the victim involving forcible control. Although such control was not by the identical means as in *Thornton*, it is clear that the movements increased to some extent the risk of harm beyond that inherent in the commission of the crime of robbery itself. Under the circumstances set forth above it appears that the asportation gave rise to dangers, not inherent in robbery, that an auto accident might occur or that the victim might attempt to escape from the moving car or be pushed therefrom by Earley. The fact that these dangers did not materialize does not, of course, mean that the risk of harm was not increased. (*People* v. *Milan* [(1973)] 9 Cal.3d 185, 193 [].) And in our opinion it cannot be said under the circumstances here appearing that as a matter of law the increase in the risk of harm was not substantial." In *People* v. *Rayford*, *supra*, 9 Cal.4th at pages 13-14, the California Supreme Court described the considerations applicable in determining whether the risk of harm was substantially increased over that present in a robbery as follows: "This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. (See, e.g., *People* v. *Lara* ([1974)] 12 Cal.3d [903,] at 908 & fn. 4 [117 Cal.Rptr. 549, 528 P.2d 365] [examples of such risk of harm 'include not only desperate attempts by the victim to extricate himself but also unforeseen intervention by third parties']; *In re Earley*, *supra*, 14 Cal.3d at p. 132 ['asportation gave rise to dangers, not inherent in robbery, that an auto accident might occur or that the victim might attempt to

escape from the moving car or be pushed therefrom by [defendant]']; cf. *People* v. *Caudillo* (1978) 21 Cal.3d 562, 574, [] [aggravated kidnapping includes review of such factors as 'the defendant's motivation to escape detection' and 'the possible enhancement of danger to the victim resulting from the movement.'].) The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased. (*In re Earley, supra*, 14 Cal.3d at p. 132; *People* v. *Lara, supra*, 12 Cal.3d at p. 908.)" Given the foregoing body of California Supreme Court decisional authority which is applicable to kidnapping with intent to rape (*People* v. *Rayford, supra*, 9 Cal.4th at p. 14), there can be no question that the uncontroverted testimony of Jacqueline M. established that the risk of harm occasioned by her lengthy asportation where defendant drove in a reckless manner was substantially greater than that present in the crime of rape.

Hence, the error was harmless. The jury believed Jacqueline M. Without the jury crediting her testimony, no guilty verdict would have been returned. In other words, crediting her testimony was essential to the jurors' determinations that: she was kidnapped; the specific intent to commit rape existed at the time of the commencement of the kidnapping; the movement was done with the specific intent to rape; and the asportation was for a substantial distance. The jury had to find these facts which were the subject of instruction in order to return the kidnapping with intent to rape verdict. Therefore, to quote the aforementioned analysis in *Pope* v. *Illinois, supra*, 481 U.S. at page 503, footnote 6 [95 L.Ed.2d at page 447], and to apply it: "[T]he facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same."

Further, the application of the *Chapman* harmless error standard to the present case is consistent with the policy concerns underlying such a test as articulated by the United States Supreme Court. In *Rose* v. *Clark, supra*, 478 U.S. at page 578 [92 L.Ed.2d at pages 470-471], while discussing the policies underlying the harmless error standard, the United States Supreme Court cited its prior decision in *United States* v. *Hasting, supra*, 461 U.S. at page 509 [76 L.Ed.2d at page 106]. In *United States* v. *Hasting,* the court discussed the problems inherent in any reversible per se test as follows: "*Chapman* reflected the concern, later noted by Chief Justice Roger Traynor of the Supreme Court of California, that when courts fashion rules whose violations mandate automatic reversals, they 'retrea[t] from their responsibility, becoming instead "impregnable citadels of technicality." ' R. Traynor, The Riddle of Harmless Error 14 (1970) (quoting Kavanagh, Improvement of Administration of Criminal Justice by Exercise of Judicial power, 11 A. B. A. J. 217, 222 (1925) [¶] Since *Chapman*, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a

whole and ignore errors that are harmless, including most constitutional violations, [citations]. The goal, as Chief Justice Traynor has noted, is 'to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error.' [Citation.] [¶] Here, the Court of Appeals, while making passing reference to the harmless-error doctrine, did not apply it. Its analysis failed to strike the balance between disciplining the prosecutor on one hand, and the interest in the prompt administration of justice and the interests of the victims on the other." (*United States* v. *Hasting, supra,* 461 U.S. at p. 509 [76 L.Ed.2d at p. 106].) Further, in *Rose* v. *Clark, supra,* the Supreme Court made reference to its prior decision in *Delaware* v. *Van Arsdall, supra,* 475 U.S. at page 681 [89 L.Ed.2d at pages 684-685] where it again referred to former California Chief Justice Traynor's analysis concerning a reversible error per se test and noted: " 'The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence [citation], and promote public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. Cf. R. Traynor, The Riddle of Harmless Error 50 (1970) ("Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it").' " (*Rose* v. *Clark, supra,* 478 U.S. at p. 577 [92 L.Ed.2d at p. 470].) In the present case, the application of the harmless error doctrine furthers the interests identified by the Supreme Court in the two cases cited in *Rose, Hasting* and *Van Arsdall* in two respects.

To begin with, in terms of the interests underlying the reversible error requirement, to reverse the judgment would require Jacqueline M. to undergo the trauma of yet another trial when the issue of guilt has been dispositively resolved notwithstanding an immaterial constitutional instructional error. Such would be contrary to the victim's interest, a factor identified in *United States* v. *Hasting, supra,* 461 U.S. at page 509 [76 L.Ed.2d at page 106].)[13] Further, the reference to former Chief Justice Traynor's observations referred to in both *Hasting* and *Rose* (*United States* v.

---

[13]Other United States Supreme Court decisions have emphasized, in other contexts, the problems inherent when any reversible error per se rule is applied in terms of the victims' interests. In *United States* v. *Mechanik* (1986) 475 U.S. 66, 72 [89 L.Ed.2d 50, 57-58, 106 S.Ct. 938], a case involving an excessive number of witnesses appearing before the grand jury, in which was unsuccessfully argued such error was reversible per se, the Supreme Court held: "The reversal of a conviction entails substantial social costs: it forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a trial that has already once taken place; victims may be asked to relive their disturbing experiences. [Citation.] The '[p]assage of time, erosion of memory, and dispersion of witnesses may render retrial difficult, even impossible.' [Citations.] Thus, while reversal 'may, in theory, entitle the defendant only to retrial, in practice it may reward the accused

*Hasting, supra,* 461 U.S. at p. 509 [76 L.Ed.2d at p. 106]; *Rose* v. *Clark, supra,* 478 U.S. at p. 578 [92 L.Ed.2d at pp. 470-471]) that reversals invite public ridicule of the judiciary when the error has no effect on the verdict has special emphasis in this case. As noted previously, when the trial was held, then existing Court of Appeal authority held that there was no requirement there be a substantial increase in the risk of harm over that present in the crime of kidnapping. In *People* v. *Bradley, supra,* 15 Cal.App.4th at pages 1151-1154, the Court of Appeal held that the increased harm requirement was not an element of a violation of section 208, subdivision (d). *Bradley* was the controlling authority at the time defendant's jury was instructed. The trial judge was jurisdictionally obligated under California law to refuse to instruct that an element of kidnapping with intent to rape was an increased risk of harm because of the *Bradley* holding. (*East Bay Municipal Utility Dist.* v. *Appellate Department* (1979) 23 Cal.3d 839, 842,

---

with complete freedom from prosecution,' [citation], and thereby 'cost society the right to punish admitted offenders.' [Citation.] Even if a defendant is convicted in a second trial, the intervening delay may compromise society's 'interest in the prompt administration of justice,' [citation], and impede accomplishment of the objectives of deterrence and rehabilitation. These societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence. But the balance of interest tips decidedly the other way when an error has had no effect on the outcome of the trial." As can be noted from the body of this opinion, we conclude this is a case where the error had "no effect on the outcome of the trial" (*ibid.*) and the retrial would require Jaqueline M. to relive the terrifying kidnapping and rape, a course of criminal conduct nobody disputes occurred.

In *Morris* v. *Slappy* (1983) 461 U.S. 1, 14-15 [75 L.Ed.2d 610, 621-622, 103 S.Ct. 1610], the court held: "In its haste to create a novel Sixth Amendment right, the court wholly failed to take into account the interest of the victim of these crimes in not undergoing the ordeal of yet a third trial in this case. Of course, inconvenience and embarrassment to witnesses cannot justify failing to enforce constitutional rights of an accused: when prejudicial error is made that clearly impairs a defendant's constitutional rights, the burden of a new trial must be borne by the prosecution, the courts, and the witnesses; the Constitution permits nothing less. But in the administration of criminal justice, courts may not ignore the concerns of victims. Apart from all other factors, such a course would hardly encourage victims to report violations to the proper authorities; this is especially so when the crime is one calling for public testimony about a humiliating and degrading experience such as was involved here. Precisely what weight should be given to the ordeal of reliving such an experience for the third time need not be decided now; but that factor is not to be ignored by the courts. The spectacle of repeated trials to establish the truth about a single criminal episode inevitably places burdens on the system in terms of witnesses, records, and fading memories, to say nothing of misusing judicial resources. [¶] Over 75 years ago, Roscoe Pound condemned American courts for ignoring 'substantive law and justice,' and treating trials as sporting contests in which the 'inquiry is, Have the rules of the game been carried out strictly?' Pound, The Causes of Popular Dissatisfaction With the Administration of Justice, 29 ABA Ann. Rep. 395, 406 (1906). A criminal trial is not a 'game,' and nothing in the record of respondent's two trials gives any support for the conclusion that he was constitutionally entitled to a new trial. The state courts provided respondent a fair trial and the United States District Judge properly denied relief." This authority is inconsistent with defendant's contention that we should adopt a reversible error per se standard in the present case.

fn. 3 [153 Cal.Rptr. 597, 591 P.2d 1249] [appellate department "acted in excess of jurisdiction . . . by its failure to comply with directions contained" in a statute and a controlling Supreme Court decision]; *Miller* v. *Superior Court* (1968) 69 Cal.2d 14, 16 [69 Cal.Rptr. 583, 442 P.2d 663] [trial judge's ruling "was error in excess of its jurisdiction" when he or she "declined to follow rules established by courts of superior jurisdiction"]; *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 454 [20 Cal.Rptr. 321, 369 P.2d 937] ["appellate department . . . exceeded its 'jurisdiction,' as that term is used in connection with the writ of certiorari, in refusing to follow a rule established by a court of superior jurisdiction."] The trial judge in the present case had no jurisdiction to give the instruction defendant now contends she was obligated to present to the jury. To apply a reversible error per se standard would to, paraphrase the words of former Chief Justice Traynor, bestir the public to ridicule such a ruling. Any honest observer of the criminal justice process would sincerely question the automatic reversal of a rape case when the trial judge was jurisdictionally required to instruct the jury as she did.[14]

## C. *Unpublished issues**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V. DISPOSITION

The judgment is affirmed except in three respects. The kidnapping for rape sentence as to count 4 is ordered stayed pursuant to Penal Code section 654. The Penal Code section 654 stay as to the Penal Code section 667.8, subdivision (a) enhancement to the sentence under count 3 is vacated and set aside. The trial court is to impose the three-year Penal Code section 667.8, subdivision (a) enhancement. The trial court is to deduct one day of conduct credits. As modified, the judgment is affirmed.

Armstrong, J., and Godoy Perez, J., concurred.

On June 29, 1995, the opinion was modified to read as printed as above.

---

[14]Apart from the theoretical jurisprudencial concerns raised by the application of the reversible error per se test to a case where the trial judge was jurisdictionally obligated to instruct as she did, there is another pertinent practical consideration. Defendant must be held accountable for the violent sexual assaults in the present case. To apply a reversible error per se test would elevate a rigid rule of process over the need for personal responsibility on defendant's part for his violent criminal conduct.

*See footnote, *ante,* page 642.